VAN NORTWICK, J.
The Sugarmill Woods Civic Association, Inc. (Sugarmill Woods), formerly known as Cypress and Oaks Villages Association (COVA), appeals a final order of the Florida Public Service Commission (PSC or Commission) entered on remand of Southern States Utils. v. Florida Pub. Serv. Comm’n, 704 So.2d 555 (Fla. 1st DCA 1997)(Southem States I). In the order on appeal, the Commission determined not to require refunds of utility payments made by customers of Florida Water Services Corporation under a uniform rate structure which had been reversed by this court in Citrus County v. Southern States Utils., 656 So.2d 1307 (Fla. 1st DCA 1995)(Citrus *722 County). We agree with the Commission’s conclusion that, under the highly unusual circumstances of this case, it would be unfair and inequitable to surcharge some customers so that other customers might receive a refund. Accordingly, we find that the Commission did not err in declining to order a refund, and we affirm.

History of the Case

This case has a long and labyrinthine history, some of the more significant twists and turns of which we discuss briefly to provide a context for our holding. The case began in 1992, when Southern States Utilities (SSU), now Florida Water Services Corporation (Florida Water or utility), filed a petition for authority to increase the rates and charges for service it provided to 127 water and wastewater systems pursuant to section 867.081, Florida Statutes (1991). Sugarmill Woods intervened. In its petition, SSU proposed establishing a rate structure of modified standalone rates[1] for those systems. When the Commission approved a rate increase for SSU, however, it ordered the utility to implement a single uniform rate structure throughout the 127 systems.
In its order, the PSC noted its statutory authority for such uniform rates and observed that it had approved uniform rates in other cases. The Commission noted the advantages of uniform rates: (1) administrative efficiencies in accounting, operations and maintenance; (2) rate stability; (3) insulation of customers from rate shock due to major capital improvements or increased operating costs; (4) recognition of economies of scale; (5) ease of implementation; and (6) lower rate case expense in the long run. Because of these advantages, combined with the wide disparity of rates among SSU’s 127 systems when calculated on a standalone basis, the Commission determined that the advantages of uniform rates outweighed the benefits of the traditional approach of setting rates on a standalone basis. The uniform rates were effective as of September 15, 1993. Citrus County and Sugarmill Woods’ predecessor, COVA, appealed. SSU filed a motion to vacate the automatic stay in effect as a result of the appeal by Citrus County, see Florida Rule of Appellate Procedure 9.310(b)(2), which was granted upon SSU posting a bond.

Citrus County

In the initial appeal, this court affirmed SSU’s final revenue requirement, but reversed the uniform rates as unlawful because there existed “no competent substantial evidence that the facilities and land comprising the 127 SSU systems are functionally related in a way permitting the PSC to require that customers of all systems pay identical rates.” Citrus County, 656 So.2d at 1310. Further, after summarizing the testimony of the various witnesses, the court observed that “[i]t is clear that this testimony does not constitute competent substantial evidence to support the PSC’s decision to set uniform statewide rates for the systems involved.” Id.
On remand, the Commission ordered SSU to implement modified standalone rates, effective as of January 23, 1996, and to make a refund to those customers whose rates under the uniform rate structure had been higher than their rates under the modified standalone rate structure. *723 The customers who would have received refunds under such order included the residents of Sugarmili Woods. In addition, the Commission refused to authorize SSU to surcharge customers who had paid lower rates under the uniform rate structure than they would have paid under the modified standalone structure, thus, requiring the utility to absorb the revenue loss of the refunds. SSU moved for reconsideration of the order.

Clark

While the rate case was on remand from Citrus County, the Florida Supreme Court issued its opinion in GTE Florida, Inc. v. Clark, 668 So.2d 971 (Fla.1996), holding that equity required a utility and its customers to be treated similarly in rate-making proceedings. Id. at 972. Clark involved an appeal from a PSC order in á telephone utility rate case by which the Commission had implemented a previous opinion from the supreme court holding that GTE could recover costs related to purchases from GTE’s affiliates. See GTE Florida, Inc. v. Deason, 642 So.2d 545 (Fla.1994). In its order on remand, the Commission allowed recovery of those costs on a prospective basis only, starting on a date over nine months after the supreme court’s mandate issued. The Commission rejected GTE’s contention that a surcharge could be used to recover such costs incurred during the period of the appeal and remand. Clark, 668 So.2d at 972. In reversing, the supreme court rejected the Commission’s rationale for denying the requested surcharge. Specifically, the court held that GTE’s failure to request a stay during the pendency of the appellate and remand processes did not preclude GTE from recovering expenses incurred during that period through the use of a surcharge nor did the imposition of a surcharge constitute retroactive rate making. Id.
In the instant case, sua sponte, the Commission ordered the parties to file briefs addressing the impact of Clark on the refund and surcharge issues raised here. Following such briefing, the Commission’s staff recommended that no refunds be ordered and that a surcharge was neither necessary or appropriate, based upon the rationale that the customers who had paid higher rates under a uniform rate structure would have a prospective rate reduction and the utility would continue to maintain its revenue requirement. The Commission, however, found that SSU had assumed the risk of making refunds by moving to vacate the automatic stay and that by posting its bond the utility had led the Commission to believe that it would stand behind any refund obligation. Accordingly, the Commission ordered the utility to make refunds to its customers who had paid higher rates under the uniform rate structure than the rates the customers would have paid if the modified standalone rates originally requested by SSU had been put in place in September 1993. The Commission construed the holding in Clark to be limited to the facts of that case and concluded that Clark did not mandate a surcharge. Further, the Commission denied the petition to intervene of some of the so-called underpaying customers, appellees herein, who sought to be heard on the surcharge issue.

Southern States I

The utility appealed. On appeal, this court held that the Commission’s decision to require the utility to make a refund to some customers without authorizing a corresponding surcharge on other customers was contrary to the principles of Clark and reversed. Southern States I, 704 So.2d at 557. The Southern States I court explained:
Following the principles set forth by the supreme court in Clark, we find that the *724 PSC erroneously relied on the notion that SSU “assumed the risk” of providing refunds when it sought to have the automatic stay lifted and therefore should not be allowed to impose surcharges. Just as GTE’s failure to request a stay in Clark was not dispositive of the surcharge issue, neither is SSU’s action in asking the PSC to lift the automatic stay. The stay itself was little more than a happenstance, in effect only because a governmental entity, Citrus County, appealed the original PSC order in this matter. See Fla. R.App. P. 9.310(b)(2); Fla. Admin. Code R. 25-22.061(3).
We are unable to discern any logic in the PSC’s contention that SSU, having merely acted according to the terms of the order establishing uniform rates, assumed the risk of refunds, yet is precluded from recouping charges from customers who underpaid because of the erroneous order. As the Supreme Court explained in Clark, “equity applies to both utilities and ratepayers when an erroneous rate order is entered” and “[i]t would clearly be inequitable for either utilities or ratepayers to benefit, thereby receiving a windfall, from an erroneous PSC order.” 668 So.2d at 973.
Id. at 559. In Southern States I, this court did not address whether it would be appropriate for the Commission to order neither a refund nor a surcharge under the particular facts of this case. The court, however, did reverse the Commission’s decision to deny intervention to customers who might be subject to a potential surcharge on remand.
On remand from Southern States I, the Commission directed the utility to calculate the exact amount of potential refunds ed surcharges. Of the so-called underpaying customers, some commercial customers would have been required to pay surcharges ranging between $20,000 and $75,000 and individual residential customers would have been required to pay surcharges ranging from several hundred to several thousand dollars. At a special Commission hearing, those customers exposed to the possibility of surcharges described the hardships that would be caused by surcharges of the magnitude calculated by the utility.
Thereafter, the Commission entered the order on appeal, determining to require neither refunds nor surcharges. Applying Clark, the Commission determined that requiring refunds would require new and even greater inequities. The Commission reasoned that allowing the newly authorized rate structure to take effect prospectively, with neither refunds nor surcharges, presented the most equitable solution because it gave some customers a prospective rate increase and others a prospective rate decrease. Sugarmill Woods appealed.

Southern States II

During the pendency of this appeal, the administrative division of this court[2] sitting en banc issued its opinion in Southern States Utils. n/k/a Florida Water Servs. Corp. v. Florida Pub. Serv. Comm’n, 714 So.2d 1046, 1051 (Fla. 1st DCA 1998)(Southem States II), an appeal of a Commission order in a subsequently filed rate proceeding involving SSU. The Southern States II court held “that, whenever the PSC has jurisdiction to set water and sewer rates for multiple systems, inter-system functional relatedness is no prerequisite to the PSC’s setting rates that are uniform across a group of systems” and *725 receding “pro tanto ” from that portion of the Citrus County opinion that required a finding of functional relatedness as a prerequisite to uniform rates. Thus, Southern States II overruled the legal principle adopted three years earlier in Citrus County — the principle which has generated the refund-surcharge dispute that is the subject of this appeal.

Analysis

It is after traveling this bumpy jurisprudential road that the instant case is before us. At issue in this appeal is Sugarmill Woods’ contention that the Commission was required to order refunds for the amount customers “overpaid” under the uniform rate structure, beginning when the uniform rate structure was implemented September 15, 1993 and ending when the modified standalone rate structure was implemented on January 23, 1996. The refund issue arises because of the difference between the rates paid under the uniform rate structure, overturned by this court in Citrus County, and the rates that would have been paid under the modified standalone rate structure. Sugarmill Woods asserts that, during the pendency of the Citrus County appeal, the utility collected more than $11 million of excess rates under the uniform rate structure from Sugarmill Woods customers, and others similarly situated, causing each of the Sugarmill Woods’ residents to be overcharged by an average of $543 for such period.
In the order on appeal, the Commission interpreted Clark and Southern States I as supporting its denial of Sugarmill Woods’ claim of refund. The Commission explained:
We find that a number of problems and inequities arise in trying to make any type of refund. It is more inequitable to surcharge customers who had no ability to change consumption or choose to remain a utility customer.' We cannot cure one inequity by creating a newer, greater inequity. We are guided by the mandates from the [Southern States /] and [Clark] decisions and the overall issue of fairness in determining the appropriate methodology. The guidelines from the Court include that neither the utility nor the ratepayers should receive a windfall from an erroneous Commission order, new customers cannot be surcharged, and ratepayers and the utility should be treated similarly. We note that any methodology of refunds and surcharges other than customer-specific may be contrary to the First District Court of Appeal’s decisions that no customer group should receive a windfall due to an erroneous order. However, even the customer-specific refund and surcharge methodology is fraught with inequities in reconciling the First District Court of Appeal’s decision that the [utility’s] revenue requirement shall not be changed.
[[Image here]]
In determining that the no refund and no surcharge option is the optimal and most equitable solution, we have recognized that this was strictly a rate structure change; the affected customers who may be subject to a surcharge have not had the ability to adjust consumption; the timing problem of customers leaving the system would be eliminated; and the utility’s revenue requirement will remain unchanged. As has been pointed out, under this scenario all customers are treated similarly in that those customers who paid too much under the uniform rate are now billed under a lower rate, those customers who paid too little under the uniform rate have received a higher rate, and the *726 utility’s opportunity to earn its authorized rate of return is maintained.
In arriving at its conclusion, the Commission noted the practical impossibility of collecting surcharges from all potential surcharge customers, because, since the 1993-1996 surcharge period, many customers had moved and, thus, had left Florida Water’s system. While Florida Water could induce current customers to pay a surcharge by disconnecting service for nonpayment of the surcharge, no similar tool existed for effecting the collection of the surcharge from former customers. Instead, Florida Water would be required to bring a civil action against those former customers who could be located and refused to pay. The Commission found that it was questionable whether Florida Water could collect sufficient surcharges to offset any refunds. Thus, the Commission concluded that “if the utility cannot, from a practical standpoint, collect the entire surcharge amount, the fairness and equity principles espoused in the [Southern States I] and [Clark] decisions have not been fulfilled.”
In Clark, the Supreme Court confirmed that the Commission possessed certain equitable authority in its rate-making role. Specifically, the court explained that “[w]e view utility rate-making as a matter of fairness. Equity requires that both ratepayers and utilities be treated in a similar manner.” Clark, 668 So.2d at 972. Reviewing the record, we agree that the Commission appropriately exercised its equitable powers in considering the substantial difficulties that would be faced in fairly collecting the necessary surcharges to offset the refunds which Sugarmill Woods proposed. Compare Department of Revenue v. Kuhnlein, 646 So.2d 717, 726 (Fla.1994)(holding that trial court was justified in rejecting proposal allowing state to collect retroactive tax because record indicated that responsible state agency would be unable to collect tax from very substantial percentage of titleholders, whose addresses could not be kept current, and agency further averred that it lacked resources necessary to track down such titleholders).
Equally important though, we are persuaded that Clark’s direction to treat ratepayers equitably required the Commission to consider the monetary impact these surcharges would have on the customers who would pay the surcharges, especially given the circumstances of this proceeding. The customers who would be subject to the surcharge did not participate as parties in the 1992 rate case or the 1996 and 1997 remand proceedings. These customers would have no real choice but to pay the surcharge rates authorized and, because the surcharge would be retroactive, would have no opportunity to adjust their consumption to lessen the impact of the surcharge. At no time were these customers on notice that they may be responsible for a retroactive surcharge, if the Commission-created uniform rate structure was reversed. This lack of notice is a crucial consideration when considering whether a surcharge and restitution are equitable. See, e.g., Stefan H. Krieger, The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Rate Making in Public Utility Proceedings, 1991 U. Ill.L.Rev. 983, 1046. (“In regard to retroactive relief for the period of the rate proceeding, the proposed analysis indicates that the crucial issue is notice. If, through the entry of an interim order, the commission has given proper notice to both the utility and the ratepayers that certain funds may be subject to retroactive recovery, the parties have no rational expectation that such relief is prohibited.”).
Sugarmill Woods argues that the equitable principle of restitution requires the *727 payment of refunds in the instant case. We conclude, however, that equity would be offended if restitution was ordered and the underpaying customers, who neither had notice that the uniform rates approved were subject to retroactive alteration nor had a chance to adjust their consumption, were required to pay the surcharges necessary to balance the payment of refunds. We recognize that restitution has been required in rate cases, see, e.g., State ex rel. Utility Consumers’ Council of Missouri, Inc. v. Public Serv. Comm’n, 585 S.W.2d 41, 59-60 (Mo.1979)(en banc)(resti-tution was awarded as remedy for unlawfully collected utility charges); People of Illinois ex rel. Hartigan v. Illinois Commerce Comm’n, 218 Ill.App.3d 168, 160 Ill.Dec. 867, 578 N.E.2d 46 (1991)(refunds of excess rates proper); Atlantic Richfield Co. v. District Court, Montrose County, 794 P.2d 253 (Colo.1990)(trial court erred in declining to determine refunds of excess rate collected by public utility during pen-dency of appeal). Nevertheless, none of these cases addressed the equitable considerations in determining whether some customers should be surcharged so that other customers could receive a refund. Rather, in each of these cases, the issue was whether the utility was required to refund because the utility had received erroneous rates. The situation in the case on appeal is vastly more complex. Here, the utility’s revenue requirement was unchanged following the implementation of uniform rates, and the uniform rates did not result in the utility earning revenue in excess of that requirement-one of the factors which led this court in Southern States I to reject the Commission’s order requiring the utility to bear the financial burden of a refund. Further, the obligation of the Commission to address both a refund and a surcharge under the facts of this case, see Southern States I, 704 So.2d at 559, distinguishes the instant case from cases involving a straightforward restitution.
Based on the above, given the highly unique facts and background of this case, we conclude that the order on appeal is within the Commission’s equitable powers under Clark. Accordingly, we AFFIRM.
BOOTH AND KAHN, JJ., CONCUR.

. As the terms have been used in this proceeding, "standalone rates” require each system to pay its own capital and operating costs plus a reasonable rate of return on the rate base for that system. "Modified standalone rates” would impose a cap on the charges for each customer in a system, notwithstanding the cost structure and rate base for that system.

. The divisions of this court were abolished in 1998 by order of the court. In re: Abolishment of Court Divisions, Administrative Order 98-3, February 15, 1998.